

FILED
OCT 17 2023

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON GRAND JURY 2021
OCTOBER 17, 2023 SESSION

UNITED STATES OF AMERICA

v.  CRIMINAL NO. 2:23-cr-00162
18 U.S.C. § 1001
18 U.S.C. § 1623

TIMOTHY J. PRIDDY

### I N D I C T M E N T

The Grand Jury Charges:

1. The charges set forth herein stem from false statements made by defendant TIMOTHY J. PRIDDY (hereinafter, "defendant PRIDDY") to federal agents and before a federal grand jury during an investigation to determine whether one or more vendors providing COVID-19 tests and mitigation services to the State of West Virginia overbilled or otherwise fraudulently received payment from federal funds disbursed through the West Virginia Department of Health and Human Resources (DHHR).

*Background*

At all times relevant to this indictment:

2. Defendant PRIDDY held various supervisory positions within the DHHR Bureau for Public Health Center for Threat Preparedness and was tasked with verifying and certifying vendor invoices before funds could be released for payment.

3. In or around June 2021, the Federal Bureau of Investigation (FBI), the Internal Revenue Service (IRS), the United States Postal Inspection Service (USPIS), and the West Virginia Commission on Special Investigations (WVCSI) began investigating certain vendors to

determine whether they had provided COVID-19 services for which they had invoiced the State of West Virginia. One part of the investigation focused on a vendor not named in this indictment (Company A) which had submitted invoices totaling approximately $44,775,308.00, purportedly reflecting the cost of approximately 518,419 COVID-19 test kits. The cost of the test kits included collection materials, laboratory analysis, and reporting of the test results. Investigators learned that Company A had only reported approximately 48,661 test results between October 2020 and March 2022. Despite the vast discrepancy between the number of tests performed and the number of test kits invoiced, defendant PRIDDY personally certified at least thirteen of Company A's invoices submitted between November 24, 2020, and March 4, 2022, totaling approximately $34,174,797.

*DHHR Received Federal Grants for COVID-19 Testing and Mitigation*

4. The COVID-19 pandemic struck West Virginia and the rest of the world in March 2020. In response, the federal government established grants to fund testing and other pandemic related mitigation efforts. West Virginia disbursed much of its allotted federal grant money through DHHR. DHHR used the grant funds in part to contract with multiple vendors that provided COVID-19 tests, testing materials, personal protective equipment, and other pandemic-related goods and services throughout the state. Vendors contracted to perform COVID-19 testing were required to report test results so that state officials would have accurate and up-to-date information relative to the number of active infections and areas experiencing outbreaks.

5. The Bureau for Public Health (BPH) was and remains a division within DHHR overseeing programs related to the health of West Virginians. BPH programs and services include local health departments, health statistics and vital records, the State Medical Examiner's Office, immunization and infectious disease services, the Office of Laboratory Services, emergency

preparedness, environmental and other health response efforts, and services directed to children, youth, and families. BPH coordinated West Virginia's response to the COVID-19 pandemic to include contracting vendors and issuing payments from federal grants targeting the pandemic.

6. The West Virginia Office of Laboratory Services (OLS) was and remains an entity within DHHR that oversees state laboratories. OLS also vets potential contract laboratory service providers to make certain that they have the necessary technical capabilities and accreditation to qualify for state contracts.

7. The Center for Threat Preparedness (CTP) was and remains a working group within BPH that serves to coordinate and deploy resources in response to a variety of public health threats. During the COVID-19 pandemic, CTP coordinated with vendors and other entities to facilitate community testing events throughout West Virginia to provide free COVID-19 testing paid for using federal grant funds. CTP was the specific group within BPH tasked with contracting and approving payment to vendors providing COVID-19 testing and related goods and services.

8. Health Command was and remains the Emergency Response Operations Unit of the CTP which served to coordinate DHHR's COVID-19 response efforts with those of other government agencies.

*Defendant TIMOTHY J. PRIDDY Certified Invoices Submitted to
DHHR by Company A Without Verifying Their Accuracy*

9. Defendant PRIDDY held a managerial role within CTP and Health Command during the COVID-19 pandemic. In March 2021, defendant TIMOTHY PRIDDY was promoted to Deputy Director of the Center for Threat Preparedness. In January 2022, he was promoted to Director of the Center for Threat Preparedness. While working at CTP and Health Command, defendant PRIDDY was frequently the point of contact for personnel for the Office of Laboratory

3

Services when they needed to verify the accuracy of invoices submitted by vendors providing COVID-19 testing and related services.

10. Company A was and remains an out-of-state vendor that contracted with the State of West Virginia to provide COVID-19 test kits, laboratory analysis, and community testing events throughout West Virginia. Company A's contract with West Virginia commenced on or about October 5, 2020, and required Company A to provide nasal swab polymerase chain reaction (PCR) diagnostic testing for COVID-19 and to upload test results electronically and immediately to the state online portal. The State of West Virginia agreed to pay $100 per test. On or about October 23, 2020, the parties modified the contract to reduce the cost to $80 per test which included collection materials and laboratory analysis. The modification further specified that Company A must upload test results to the state epidemiology reporting system (WVEDS) within 24 to 48 hours. On or about December 10, 2020, the parties further modified the contract to include saliva testing at a rate of $119 per test. The modification required Company A to provide "Direct Saliva COVID-19 Test[ing] to include a collection kit, shipping to the customer and the laboratory, laboratory analysis, and results being reported to the customer and the state."

11. Company A provided COVID-19 testing for specific DHHR programs and initiatives. For example, beginning in approximately October or November 2020, Company A shipped COVID-19 test kits to various Emergency Medical Service (EMS) entities whose personnel required frequent testing as a requirement of their employment. Shortly thereafter, in November or December 2020, Company A began providing COVID-19 test kits to DHHR programs related to Residential Youth Facilities and Hospice agencies. In January 2021, Company A again expanded its service to include certain "steady state" entities. "Steady state" entities are locations such as pharmacies having a permanent physical location where people could come to

4

be tested for COVID-19. Between on or about November 10, 2021, and on or about January 10, 2022, Company A provided COVID-19 testing services as part of a back-to-school initiative funded through newly-enacted federal grants to facilitate the safe return of kindergarten through twelfth grade students following the Thanksgiving and winter holiday breaks (the K-12 Program).

12. In June 2021, federal investigators became aware that there was a significant disparity between the number of COVID-19 tests for which Company A billed DHHR and the number of test results reported to the online portal. A federal grand jury began to investigate whether any crimes had been committed in connection with the tens of millions of dollars paid to Company A for COVID-19 testing. The federal grand jury investigation focused on whether individuals associated with Company A and DHHR had committed wire fraud in violation of 18 U.S.C. § 1343, money laundering in violation of 18 U.S.C. § 1957, and theft from a federal program in violation of 18 U.S.C. § 666.

13. Between November 24, 2020 and February 4, 2022, defendant PRIDDY certified thirteen Company A invoices totaling approximately $34,174,797. Defendant PRIDDY certified that the items listed on the invoices had been verified so that DHHR could issue payment to Company A. However, defendant PRIDDY certified the invoices without first verifying that Company A had in fact provided the COVID-19 testing kits and other goods and services as set forth in the invoices. Further, defendant PRIDDY created receiving reports (West Virginia State Auditor's Office Form RR1) for nine of the invoices falsely stating "[a]ll deliveries have been confirmed with the receiving facilities" or "[V.H.] from the Office of Emergency Medical Services confirms materials were delivered to jobsites."

*Defendant PRIDDY Made False Statements to Federal Agents*
*And Committed Perjury While Testifying Before the Federal Grand Jury*

14. On August 2, 2022, defendant PRIDDY was interviewed by a Special Agent of the Federal Bureau of Investigation and a United States Postal Inspector, both of whom were investigating Company A for violations of federal law. The interview occurred at defendant PRIDDY's office in Charleston, Kanawha County, West Virginia.

15. On September 8, 2022, defendant PRIDDY testified before a federal grand jury sitting in Charleston, Kanawha County, West Virginia.

16. In both his interview and before the federal grand jury, defendant PRIDDY made false statements, as set forth more specifically below, that he had verified Company A's invoices before certifying them for payment. These false statements significantly affected the investigation in that had defendant PRIDDY actually verified the invoices, it would have been material and relevant evidence in the investigation of Company A.

## **COUNT ONE**

17. The allegations contained in paragraphs 1 through 16 of this Indictment are incorporated herein as if set forth in full.

18. On or about August 2, 2022, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, defendant TIMOTHY J. PRIDDY, in a matter within the jurisdiction of the executive branch of the Government of the United States, did knowingly and willfully make materially false statements and conceal material facts in that defendant TIMOTHY J. PRIDDY told a Special Agent of the Federal Bureau of Investigation and a United States Postal Inspector that he had certified invoices submitted by Company A related to

a back-to-school COVID-19 testing program (K-12 Program) only after they had been verified by individuals working with the program.

19.     Defendant TIMOTHY J. PRIDDY knew this statement was false because he had undertaken no effort to verify the invoices.

In violation of Title 18, United States Code, Section 1001.

## COUNT TWO

20.     The allegations contained in paragraphs 1 through 16 of this Indictment are incorporated herein as if set forth in full.

21.     On or about August 2, 2022, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, defendant TIMOTHY J. PRIDDY, in a matter within the jurisdiction of the executive branch of the Government of the United States, did knowingly and willfully make materially false statements and conceal material facts in that defendant TIMOTHY J. PRIDDY told a Special Agent of the Federal Bureau of Investigation and a United States Postal Inspector that he had certified invoices submitted by Company A related to COVID-19 testing for state Emergency Medical Services (EMS), Hospice agencies, youth residential services, and "steady state" facilities only after he or one of his staff had verified the invoices.

22.     Defendant TIMOTHY J. PRIDDY knew this statement was false because he had undertaken no effort to verify the invoices.

In violation of Title 18, United States Code, Section 1001.

## COUNT THREE

23. The allegations contained in paragraphs 1 through 16 of this Indictment are incorporated herein as if set forth in full.

24. On or about September 8, 2022, at or near Charleston, Kanawha County, West Virginia and within the Southern District of West Virginia, defendant TIMOTHY J. PRIDDY, while under oath and testifying before a duly empaneled grand jury of the United States District Court for the Southern District of West Virginia, and contrary to such oath knowingly did make false material declarations.

25. At the aforementioned time and place alleged, the grand jury was conducting an investigation to determine whether Company A or individuals associated therewith had committed wire fraud in violation of 18 U.S.C. § 1343, money laundering in violation of 18 U.S.C., § 1957, and theft from a federal program in violation of 18 U.S.C. § 666. It was material to said investigation that the grand jury determine whether Company A had performed the COVID-19 testing and related services for Emergency Medical Services (EMS) agencies as reflected on the invoices Company A submitted to the State of West Virginia.

26. At the time and place alleged, defendant TIMOTHY J. PRIDDY, appearing as a witness at a proceeding before the grand jury, did knowingly make the following false material declarations in response to questions involving the material matters alleged in paragraph 25:

> Q: But once the contracts were entered into, did you have any role with the invoices that were produced by the vendors?
>
> A: It depended on the type of testing that went on, but yes, I would have some involvement.
>
> Q: What was your involvement usually?
>
> A: So, when a contract went in place, we'd be notified. That way we could start utilizing that vendor for testing. And then, depending on what type of testing

9

they did, if it was testing that we regulated out of the Center for Threat Preparedness directly, then the invoices would come to our office. We would work to verify the invoices, sign off on those, and then send them to be paid.

*****

Q: So, what steps did you take to generate these receiving reports for the [Company A] invoice? How would you do that?

A: So, when the Office of EMS had a Director for the EMS testing portion of it, I would reach out to her to confirm with the EMS agencies what was received. And then, once she confirmed that that was received, I'd sign the receiving report, the invoice, and sent it over. <u>When she was no longer in that position and it was vacated, then I worked with my own staff to do the same thing. They would reach out and sample the EMS agencies to see that they were receiving material and how much material they were receiving to make sure it was consistent with what we were being invoiced.</u>

Q: So, when you say they would sample these agencies, generally how many agencies would they call?

A: <u>A dozen or so.</u>

Q: And how many members of your staff would be working on this?

A: I identified three people that had worked on that.

Q: And who were those three people?

A: <u>Mr. [R.W.], he headed that up. Mr. [T.L.] and Ms. [M.H.].</u>

Q: And do they generally work at – whenever the invoices came in, did you divide up the work among the three of them then or did they take turns confirming the invoices?

A: <u>So, I'd pass that on to Mr. [R.W.], and then he could divide that up however he wanted to, or he could do it himself. And then they would let me know that that's good to go or if there was a problem, what the problem was so that we could get that figured out.</u>

Q: You said they would call a dozen agencies –

A: Yeah.

Q: – just at random?

A: Yes, sir.

Q: How would they know which agencies received X number of kits?

A: We had a list of agencies that were receiving – part of the program, if you will. We had a list of agencies that were part of that program. They'd go off that list to get them.

\*\*\*\*\*

Q: And if they were told, "No, we didn't receive anything," how would you verify that the numbers that [Company A] said they sent are actually true?

A: <u>Well, they would go on with doing a sampling of these agencies to see that the numbers were consistent</u>.

Q: How could you do that if you had no idea which agencies received them?

A: <u>Well, again, if we have a list of the hundred agencies, and they randomly pick 12 agencies and call them and all of them had received stuff, and one agency received 60 and the other received 150, and whatnot, and they look at that and go, okay, well, we called ten percent of the participating agencies and accounted for ten percent of the total amount that was shipped, then they would say that was okay</u>.

\*\*\*\*\*

Q: Well, maybe my mind just doesn't work well enough for this, but if [Company A] says they sent, let's say, 10,000 kits to various EMS agencies, and there's 212 in the state, but maybe 100 of them are participating in this program, and I think the number might actually be higher, but let's say it's 100, and so, [Company A] doesn't tell you which agency they sent them to. You have three people calling at random any one of these hundred. County such-and-such may say, "Oh, yeah, we got 10." Another EMS agency said, "Oh, yeah, we got twenty." But without knowing what [Company A] was supposed to send them, how could you actually verify that what – that [Company A's] totals were accurate if you're only calling a dozen?

A: Well, so we had to have a system to do that, and sampling was the best system that we could come up with to do that.

Q: Yeah, but I'm saying how can you compare it to anything? Like if you can sample and get a number, oh yeah, 10 for here, 20 here, 30 there, and that gives you a total of 60 in that particular instance, how do you know that [Company A's] numbers are correct if you don't know how many they sent to any particular agency?

11

A: We don't, I don't have a way to verify that it's down to the number. I don't have a system for that. I don't have people that have time to call every single agency every few weeks to ask those questions.

Q: Why didn't you just ask [Company A], give me a list of particular agencies?

A: I didn't think to ask them that.

\*\*\*\*\*

Q. So we couldn't actually verify that [Company A's] numbers are accurate?

A: We can only verify through sampling. We couldn't verify a hundred present. And I –

Q: I'm not sure I can verify any percent.

A: Okay. Well, this is the process that we used. This was acceptable to us, and that's what we did…

\*\*\*\*\*

Q: You said this process was the one that was acceptable to us. Who was the "us" in that sentence?

A: Everybody involved. So that would be my office, as it was when we were with the Bureau for Public Health, going up through [Deputy Commissioner] and the State Health Officer, the Secretary's office, purchasing, the Office of Epidemiology.

\*\*\*\*\*

Q: When you say we, who's we?

A: The Center for Threat Preparedness.

Q: You?

A: Me and the team. I think when we started doing this [D.H.] was the Director, but yes, we as the team.

Q: So, [D.H.] approved it?

A: Oh, yea. Absolutely.

27. Defendant TIMOTHY J. PRIDDY knew the underscored declarations above were false when he made them in that he knew that neither he, nor anyone at his direction sampled EMS agencies to verify that they were receiving the test kits and other materials invoiced by Company A.

In violation of Title 18, United States Code, Section 1623.

## COUNT FOUR

28. The allegations contained in paragraphs 1 through 16 of this Indictment are incorporated herein as if set forth in full.

29. On or about September 8, 2022, at or near Charleston, Kanawha County, West Virginia and within the Southern District of West Virginia, defendant TIMOTHY J. PRIDDY, while under oath and testifying before a duly empaneled grand jury of the United States District Court for the Southern District of West Virginia, and contrary to such oath knowingly did make false material declarations.

30. At the aforementioned time and place alleged, the grand jury was conducting an investigation to determine whether Company A or individuals associated therewith had committed wire fraud in violation of 18 U.S.C. § 1343, money laundering in violation of 18 U.S.C., § 1957, and theft from a federal program in violation of 18 U.S.C. § 666. It was material to said investigation that the grand jury determine whether Company A had performed the COVID-19 testing and related services related to the back-to-school program (K-12 Program) as reflected on the invoices Company A submitted to the State of West Virginia.

31. At the time and place alleged, defendant TIMOTHY J. PRIDDY, appearing as a witness at a proceeding before the grand jury, did knowingly make the following false material declarations in response to questions involving the material matters alleged in paragraph 30:

> Q: And how did you – since you signed and approved these invoices, how did you verify that this amount of testing actually occurred in each county?
>
> A: <u>By reaching out to – I believe it was Mr. [K.B.] to get the numbers on that</u>.
>
> Q: Okay. So you reached out to him, and he's the one that told you that – ?
>
> A: <u>Confirmed, yeah. Confirmed these testing numbers for me, so</u> –
>
> Q: And how did you reach out to him? Did you call him, or did you email him?

14

A: If I would have emailed him, I think you'd have a copy of that because it would have said, "[Company A] invoices" on there I'm sure. It might have been a phone call. But he might have been copied on these, too. I don't know when these got emailed to me. And maybe I spoke with him and referenced these. I don't know. <u>But I would have reached out to him to confirm these numbers before signing off on these invoices.</u>

*****

Q: And you said that was [K.B.] who was confirming this for you?

A: <u>He's the one that gave me the information. He's the one who confirmed it with me.</u> I don't know if he was the actual person making phone calls or not, but –

Q: So, you didn't make phone calls –

A: No.

Q: – or no one from your team did?

A: No.

Q: [K.B.] was responsible for that?

A: <u>Correct</u>.

Q: And then he would give you the numbers and say, yes, this, for example, Exhibit 21, totals 69, whatever that number is, 69,813 or something like that?

A: Oh, I'm sorry. 69,813 I believe is correct, yes.

Q: So, he's the one that would say, "Yeah, that number's correct?"

A: <u>He would verify it by the county, what you have on page two.</u>

    32.    Defendant TIMOTHY J. PRIDDY knew the underscored declarations above were false when he made them in that he knew that he had never sought confirmation from K.B. to verify that the schools participating in the K-12 Program were receiving the test kits and other services and materials invoiced by Company A.

In violation of Title 18, United States Code, Section 1623.

                              WILLIAM S. THOMPSON
                              United States Attorney

By:    _____
        JOSHUA C. HANKS
        Assistant United States Attorney